# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : CRIMINAL ACTION NO. 01-cr-0429 |
| GLEN GUADALUPE. | : |

**MEMORANDUM**

YOHN, J.                                                           January 3, 2013

Glen Guadalupe filed a petition for a writ of error coram nobis, requesting that the court vacate his conviction for obstruction of justice under 18 U.S.C. § 1512(b)(3). For the reasons discussed below, Guadalupe's petition for a writ of error coram nobis will be denied.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

On March 11, 1999, Dante Hunter,[2] an inmate at Curran Fromhold Correctional Facility ("CFCF"), was beaten by two correctional officers, Reginald Steptoe and Cornell Tyler. At the time of the beating, Guadalupe was the Deputy Warden of Operations at CFCF. Linda Burnette, a correctional lieutenant at the time of the beating, testified at trial that she witnessed Steptoe and Tyler punch and beat Hunter. Additionally, she testified that she commanded Steptoe and Tyler

---

[1] The following facts are derived from the Third Circuit's factual summary of this case in *United States v. Guadalupe*, 402 F.3d 409 (3d Cir. 2005), and from the record before this court.

[2] There is a discrepancy in the record regarding the spelling of Hunter's first name. At times Hunter's first name is spelled Dante, while at other times it is spelled Donti. Because the Third Circuit used the spelling Dante in its opinion, *United States v. Guadalupe*, 402 F.3d 409 (3d Cir. 2005), I will also use that spelling in this opinion.

to stop harming Hunter; however, they refused to do so. At trial, several witnesses corroborated Burnette's testimony.

Shortly after Burnette witnessed the beating, she notified her supervisor, Captain Winston Boston, about the beating and informed him that Steptoe and Tyler ignored her command to stop. After she left Captain Boston, Burnette went to see Guadalupe to report the incident. Burnette testified that Guadalupe responded to her information about the incident by stating that the officers involved were "going to burn" for what happened. However, when Burnette told Guadalupe that Steptoe and Tyler were responsible for the beating, Guadalupe's position changed. He responded to her allegations by stating "they can't burn ...they are my boys, my homies."

After this initial conversation with Guadalupe, Burnette returned to the prison unit. Later, Guadalupe, Boston, and Burnette resumed discussion of the beating. At this meeting, Guadalupe stated that he had informed the officers involved in the beating that "someone had to come up with an injury to justify the amount of force" used on Hunter. Additionally, Guadalupe instructed Burnett that in her memorandum about the beating she should not mention that she had ordered the officers to stop.

Burnette testified that because she felt intimidated and was afraid to "go against the grain," she lied in her written statement to Captain Boston and in her first two statements to Internal Affairs. On March 21, 1999, Burnette called Warden Walter Dunleavy and told him that she had lied about the beating. Two days later, on March 23, 1999, she gave a full statement to Internal Affairs.

Guadalupe went to trial on April 15, 2002. On May 1, 2002, the jury found Guadalupe guilty of one count of obstruction of justice, under 18 U.S.C. § 1512(b)(3), based on his conduct toward Burnette. On August 8, 2003, I sentenced Guadalupe to fifteen months of imprisonment, two years of supervised release, a fine of $300, and a special assessment of $100. Guadalupe appealed the conviction and argued that (1) the jury's verdict was not supported by legally sufficient evidence; and (2) that the district court erred in instructing the jury by failing to define "corruptly persuades." On March 31, 2005, the Third Circuit affirmed. *Guadalupe*, 402 F.3d at 409. Guadalupe filed a writ of certiorari, which was denied by the United States Supreme Court on May 1, 2006. *Guadalupe v. United States*, 547 U.S. 1123 (2006).[3] Guadalupe brings this petition for a writ of error coram nobis in light of the recent decision by the Supreme Court in *Fowler v. United States*, 131 S. Ct. 2045 (2011).

## II. STANDARD OF REVIEW

The writ of error coram nobis is a form of relief available to federal courts in criminal matters under the All Writs Act, 28 U.S.C. § 1651(a). *See United States v. Morgan*, 346 U.S. 502, 511 (1954). A writ of error coram nobis is only "used to attack allegedly invalid convictions which have continuing consequences, when the petitioner has served his sentence and is no longer 'in custody' for purposes of 28 U.S.C.A. § 2255." *United States v. Stoneman*, 870 F.2d 102, 105-06 (3d Cir. 1989). Additionally, the error must be fundamental to justify the extraordinary relief. *See id.* at 106.

---

[3] No motion under 28 U.S.C. § 2255 was filed. Guadalupe has completed his prison sentence and his two-year term of supervised release.

Because of the court's interest in the finality of judgements, the standard for a writ of coram nobis is more stringent than both the standard applicable on direct appeal and the standard applicable for a petitioner seeking habeas corpus relief under § 2255. *Id.* The writ is so extraordinary that the Supreme Court commented that "it is difficult to conceive of a situation in a federal criminal case today where [a writ of coram nobis] would be necessary or appropriate." *Carlisle v. United States*, 517 U.S. 416, 429 (1996). Thus, "an error which could be remedied by a new trial, such as an error in jury instructions, does not normally come within the writ." *Stoneman*, 870 F.2d at 106. Additionally, "earlier proceedings are presumptively correct and the petitioner bears the burden to show otherwise." *Id.*

Because coram nobis is an extraordinary remedy, to establish a right to relief the petitioner must fulfill several requirements. First, the petitioner must show that although he is no longer in custody for the purposes of § 2255, he continues to suffer collateral consequences from his allegedly invalid conviction. *Id.* at 105-06. Additionally, the petitioner must show that there was no remedy available at trial and that there were sound reasons for not seeking relief earlier. *Id.* at 106. Finally, the petitioner must prove that the writ is necessary to correct a fundamental error. *Id.*

## III.     DISCUSSION

Guadalupe argues that he has satisfied the strict requirements for a writ of error coram nobis. However, I conclude that the jury was properly instructed under *Fowler* and that there was sufficient evidence at trial to convict Guadalupe under 18 U.S.C. § 1512(b)(3). Thus, there is

4

no fundamental error or an invalid conviction and the petitioner's request for a writ of error coram nobis will be denied.[4]

Guadalupe was convicted under § 1512(b)(3) based on his conduct toward Burnette. 18 U.S.C. § 1512(b)(3) makes it a federal offense to "knowingly intimidate[]...or corruptly persuade[] another person or attempt[] to do so...with intent to hinder, delay, or prevent the communication to a law enforcement officer...of the United States of information relating to the commission or possible commission of a Federal Offense." 18 U.S.C. § 1512(b)(3). Additionally, 18 U.S.C. § 1512 provides that "an official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(f)(1). Finally, the statute explains that "no state of mind need be proved with respect to the circumstance... that the law enforcement officer is an officer or employee of the Federal Government." 18 U.S.C. § 1512(g)(2).

In *Fowler v. United States*, the Supreme Court addressed the question of what the government must prove to convict a defendant under 18 U.S.C. § 1512–the federal witness tampering statute–when the defendant has the intent to prevent a communication with law enforcement, but not specifically with *federal* law enforcement.[5] 131 S. Ct. at 2048. Charles

---

[4] I will assume, without deciding, that Guadalupe has met the other coram nobis factors for purposes of this memorandum.

[5] Although *Fowler* addressed 18 U.S.C. § 1512 (a)(1)(C), and not 18 U.S.C. § 1512 (b)(3), which is at issue in this case, the language in the two sections is almost identical. The only difference between the sections is the type of offending contact each section addresses. Specifically, 18 U.S.C. § 1512 (b)(3) applies when a defendant intimidates, threatens, or corruptively persuades another to prevent communication, while 18 U.S.C. § 1512 (a)(1)(C) applies when a defendant commits murder to prevent communication. In noting their similarity, the Third Circuit stated that § 1512 (a)(1)(C) is like § 1512 (b)(3) because it is also "an investigation-related provision aimed at protecting the communication of information to law enforcement." *United States v. Shavers*, 10-2971, 2012 WL 3641752 (3d Cir. Aug. 27, 2012).

Fowler shot and killed a local police officer when the officer came upon him and a group of men preparing to rob a Florida bank. Fowler was convicted of violating § 1512 (a)(1)(C). On appeal, Fowler argued that his conviction under § 1512 (a)(1)(C) was in error because the government had not established that Fowler killed the officer to prevent him from communicating with *federal* officers. *Id.* at 2048. The Eleventh Circuit affirmed the conviction and held that a "possible or potential communication to federal authorities of a possible federal crime is sufficient" to establish a federal nexus. *United States v. Fowler*, 603 F.3d 883 (11th Cir. 2010), vacated and remanded, *Fowler*, 131 S. Ct. at 2045 (2011).

      The Supreme Court rejected the Eleventh Circuit's "possible or potential communication" standard. Instead, it concluded that while the statute does apply to a defendant who kills with the intent to prevent communication to law enforcement generally, "the Government must show a *reasonable likelihood* that, had, e.g., the victim communicated with law enforcement officers, at least one relevant communication would have been made to a *federal* law enforcement officer." *Fowler,* 131 S. Ct. at 2052 (emphasis added). In reaching this conclusion, the Supreme Court noted that "the government need not show that such a communication, had it occurred, would have been [with a federal officer] beyond a reasonable doubt, nor even that it is more likely than not." *Id*. But it must show that "the likelihood of communication to a federal officer was more than remote, outlandish or simply hypothetical." *Id.*

      Guadalupe argues that, in his case on direct appeal, the Third Circuit applied a standard for the federal nexus requirement similar to the Eleventh Circuit's in *Fowler*. (Pet'r's Br. 23.) Specifically, he points to the Third Circuit's statement in *Guadalupe* that proving a violation of the federal witness tampering statute depends on "the *possible* existence of a federal crime and a

6

defendant's intention to thwart an inquiry into that crime by officials who happen to be federal." *(Id.)* (quoting *Guadalupe*, 402 F.3d at 411.) Additionally, Guadalupe points to the Third Circuit's reliance on its precedent in *United States v. Applewhaite,* which stated that the federal nexus is met when defendants "intended to influence an investigation which later became federal." 195 F.3d 679, 687 (3d Cir. 1999). Moreover, Guadalupe notes that in reaching its conclusion in both *Applewhaite* and *Guadalupe,* the Third Circuit relied on the Eleventh Circuit's holding in *United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998), which the Eleventh Circuit applied in *Fowler*. Thus, he contends that because the Third Circuit's standard is similar to the standard in *Fowler*–a standard that was rejected by the Supreme Court–his conviction was in error. (Pet'r's Br. 23.)

The government points out that while the Third Circuit in *Guadalupe* relied on the precedent established in *Applewhaite*, the court also held there was sufficient evidence to convict under the higher burden it articulated in *Stansfield* and *Bell*. (Resp't's Br. 9-10.) In *Stansfield* and *Bell*, the Third Circuit held that the government must prove that "the defendant believed that the person [] might communicate with federal authorities," to establish a federal nexus under 18 U.S.C. § 1512. *United States v. Bell*, 113 F.3d 1345, 1349 (3d Cir. 1997) (quoting *United States v. Stansfield*, 101 F.3d 909, 918 (3d Cir. 1996). In these two cases, the Third Circuit explained that "the government may carry this burden by showing that the conduct which the defendant believed would be discussed in these communications constitutes a federal offense, so long as the government also presents 'additional appropriate evidence.'" *Id.* In *Guadalupe,* the Third Circuit specifically addressed this, stating "we also stay faithful to the teachings of *Stansfield* and *Bell* because there is 'additional appropriate evidence' that Guadalupe knew or should have know that

7

Burnette might communicate with federal officials based on [Guadalupe's] position and experience as prison administrator." *Guadalupe*, 402 F.3d at 413.

Guadalupe contends that the "additional evidence" of his prison administration experience, upon which the Third Circuit relied, still does not satisfy the "reasonable likelihood" standard articulated in *Fowler*. Neither party refers to the jury charge in their briefs, however, the jury charge given in this case, as petitioner agreed at oral argument, comports with the standard recently articulated in *Fowler*. The jury charge stated that "[it] is sufficient, if the information *likely* would have been transferred to a federal agent, irrespective of the governmental authority represented by the initial investigators." *See* Trial Tr. 170:21-24, Apr. 26, 2002 (emphasis added). In *Fowler*, the Supreme Court only required the government to prove that there was a "reasonable likelihood" that the information would have been communicated to a federal officer. *Fowler,* 131 S. Ct. at 2052. Additionally, the Supreme Court noted that this "reasonable likelihood" standard does not require that the government to prove"that it [was] more likely than not" that the communication would have been with a federal officer, but only that "the likelihood of communication to a federal officer was more than remote, outlandish or simply hypothetical." *Id.* Thus, the jury charge used in this case that "the information likely would have been transferred to a federal agent" is a higher standard than *Fowler's* reasonable likelihood standard.

Consequently, the only question left is whether the evidence presented at trial was sufficient for a jury to find that it was likely that Burnette would have communicated with a federal officer. As *Fowler* was decided in 2011, the Third Circuit has not yet had the opportunity to analyze what evidence the government must produce to meet *Fowler'*s reasonable likelihood standard. The Fourth Circuit, however, has recently interpreted the reasonable likelihood

standard in *U.S. v. Ramos-Cruz*, 667 F.3d 487 (4th Cir. 2012). In *Ramos-Cruz*, the defendant was convicted of witness tampering under § 1512 (a)(1)(C) for his involvement in the murder of a gang member named Randy Calderon, who was considering communicating with the police about an earlier murder of a fellow gang member named Eluith Madrigal. *Id.* at 491. Ramos-Cruz directly appealed his conviction and argued that in light of the recent *Fowler* decision, the judge improperly instructed the jury regarding the federal nexus requirement of § 1512 (a)(1)(C). *Id.* at 494.

Before the *Fowler* decision, the Fourth Circuit had discussed what was necessary to establish the federal nexus requirement of § 1512 (a)(1)(C) in *United States v. Harris,* 498 F.3d 278, 286 (4th Cir. 2007). In *Harris*, the Fourth Circuit explained that "[s]o long as the information the defendant seeks to suppress actually relates to the commission or possible commission of a federal offense, the federal nexus requirement is established." *Id.* In *Ramos-Cruz*, the Fourth Circuit concluded that because its federal nexus test articulated in *Harris* was analogous to the test overturned in *Fowler, Harris* was no longer controlling. *See Ramos-Cruz*, 667 F.3d at 495. Additionally, because the district court relied on *Harris* in instructing the jury, the jury instructions regarding the federal nexus requirement were erroneous. *Id.* at 496. Thus, the court noted that it must "determine whether the misinstruction was harmless error" by reviewing whether, "based on the evidence presented, a jury rationally could have found that there was no reasonable likelihood that had Calderon 'communicated with law enforcement officers, at least one relevant communication would have been made to a federal enforcement officer.'" *Id.* at 496. (citing *Fowler*, 131 S. Ct. at 2052.)

9

The Fourth Circuit upheld Ramos-Cruz's conviction under the reasonable likelihood standard articulated in *Fowler*. Specifically, the court noted that one month after Calderon's murder, a task force comprised of federal and local officers was formed to investigate homicides by gang members in the area. *Id.* at 497. Additionally, the court pointed out that the local detective investigating the underlying murder of Madrigal testified that she exchanged information with federal officers. *Id.* Thus, the court held that "when, as occurred here, federal law enforcement authorities became involved in an investigation approximately a month after the relevant murder, federal authorities are specifically focusing on the group in question, and local authorities investigating the underlying crime are actively cooperating with federal law enforcement officers, the reasonable likelihood standard has been met." *Id.* at 498-99.

Here, unlike *Ramos-Cruz*, the jury instruction was not in error. Moreover, like the investigation in *Ramos-Cruz*, the jury in this case was presented with evidence that the federal investigation began the same month as the beating on March 11, 1999. At trial, FBI Special Agent Wiley Taylor testified that he was the initial federal investigator on the case. On cross examination by defense counsel he testified that by May 30, 2000, he had already been investigating the case for 15 months.[6] (*See* Trial Tr. 60:26-64:5, Apr. 24, 2002.) Additionally, and similar to *Ramos-Cruz*, in this case the federal investigation specifically focused on the underlying crime–the beating of Hunter by prison guards–that Guadalupe was convicted of trying to cover up under 18 U.S.C. § 1512(b)(3).

---

[6] Given that the court must make all reasonable inferences in favor of the government as verdict winner, *see United States v. Pressler*, 256 F.3d 144, 156 (3d Cir. 2001), Agent Wiley's repeated statement that he had been investigating the case for fifteen months at the time he interviewed Hunter on May 30, 2000, is sufficient to establish that the federal investigation of Hunter's beating by the correctional officers had started within a month of the beating.

Moreover, as noted by the Third Circuit, the beating of a prisoner by prison guards is a crime frequently prosecuted at the federal level,[7] whereas murder is more often prosecuted at the state level. Therefore, it was even more likely in a case such as this that a victim of witness tampering would have communicated with a federal officer absent the illegal coverup. It follows then, that at the time of Guadalupe's conduct, the likelihood that Burnette would speak to a federal investigator was much "more than remote, outlandish or simply hypothetical."[8] *Fowler*, 131 S.Ct. at 2052. In fact, Burnette testified at trial that she did eventually speak to the FBI during the investigation. *See* Trial Tr. 51:7-10, Apr. 17, 2002. Thus, based on the evidence presented at trial, the reasonable likelihood standard articulated in *Fowler* has been met. There was more than sufficient evidence to support the jury's finding that it was "likely" that the information would have been transferred to a federal agent and the jury could not have reasonably found that there was no "reasonable likelihood" of a communication to a federal officer since it did find that it was "likely" that the information would have been transferred to a federal agent.[9] Accordingly, Guadalupe has not shown that his conviction was the result of a

---

[7] On direct appeal of this case, the Third Circuit detailed the multitude of cases where prison administrators have been prosecuted for beating an inmate under 18 U.S.C. § 242. *See Guadalupe*, 402 F.3d at 414.

[8] The Supreme Court gave an example of a remote possibility of communication to a federal law enforcement officer: "Jonah who kills Smith to prevent his communication with law enforcement officers in general, does not kill Smith to prevent his communicating with Lithuanian law enforcement officers, for there is no reasonable likelihood that any Lithuanian officers would become involved." *Id.* at 2052.

[9] The Third Circuit's statement in footnote 3 of *Guadalupe* supports this conclusion. See *Guadalupe*, 402 F.3d at 415 n.3 (concluding that "Guadalupe knew or should have known from his unique perspective that federal officers were highly likely to be involved at some point in the investigation...").

fundamental error or illegal.

## IV. CONCLUSION

For the reasons explained above, I will deny Guadalupe's petition for a writ of error coram nobis. An appropriate order accompanies this memorandum.